Alrighty, thank you for your patience. Our first and only case for this morning is AXALTA Coding Systems v. FAA, number 23-2376. Let me first offer my congratulations as well to the admittees. I remember the day well. Very little I still remember. It was a short time ago, right? Just in the last century. I see, okay, very good. That's all it was. Well, welcome. Thank you. May it please the court, I'm Jerry Cox, Counsel for Petitioner. May I reserve five minutes for rebuttal? You may. Thank you. AXALTA Coding Systems asks this court to vacate a civil penalty order based on an alleged knowing violation of the Hazardous Materials Transportation Act. AXALTA was convicted in an in-house administrative proceeding where the government was the accuser, the prosecutor, the judge, the jury, and the appellate decision maker. AXALTA has presented in its briefs several reasons to vacate the order. The government has helped this court narrow those issues down by making three really important concessions, and I will focus on those concessions. If I could list them, that would probably help all of us. The first, the government says on page 19 of its brief, we do not contest that this civil penalty order implicates the Seventh Amendment. Second concession is – But just to – I'll let you go on, but that may not be the end of the analysis. That's just the first step. Your brief seems to say otherwise, but I'd like to ask you about – I'll let you do all three of them. They're concessions. But they are concessions indeed, but we would like to talk about sort of how you view – I'll go from there. What Jarkissi told us. Okay, thank you. The second concession they make in the 28-J letter that they sent last week, they acknowledge that this order was issued by a DOT employee who had no constitutional authority to issue it. And the third concession is the government does not seriously contest that Exalta's liability under this statute is supposed to be measured under a reasonable person standard, essentially a negligent standard. And let me explain why I think the government's concession about this implicating jury rights decides the whole case. This really is – No, it doesn't. This is the second step of whether it's public rights or not. Judge, I think that the public rights analysis is just one of the shingles on the Atlas Roofing case that's already been blown off, I think. Okay, the Supreme Court has made it very clear. If there are two precedents and one is directly on point and then another later one seems to undercut it, we as a lower court, we can complain, but we have to follow the precedent that's on point. How is this case distinguishable from Atlas Roofing? First of all, this is not a building code, the Hazardous Materials Regulations. There are 1,200 pages of them. It does not say you will have a seven-foot wide beam. It says you will make decisions. Oh, I'm sorry, Judge. Isn't it actually more complex? Well, only in the sense that it allows for discretion on the part of the person who's doing the job. And when you have a question of discretion, the issue is going to be, in this case, did the hazmat packer do what a reasonable hazmat packer would do under the circumstances? That's not what you have in a building code. Either you did it or you didn't. You don't have a jury question there. But if you're having to ask, did this person do what a reasonable person acting with reasonable care, were they supposed to do something different from what they did with this particular can of paint that's involved? Are you saying ATLAS is no longer good law? I'm saying, Judge, that, as I've said before, my analogy is a lot of the shingles have been blown off by previous decisions. This court doesn't have to decide whether it is or it isn't because JARCISI tells us that there are two questions. The rationale for JARCISI is there are two questions that we start with, and then they say that that is all but dispositive. What the government's trying to do here— JARCISI avoids overruling ATLAS roofing. It notes criticism. It doesn't overrule it. Tell us how we would write an opinion that says this case is distinguishable from ATLAS. What ground would allow us to distinguish this case? Because JARCISI says that there are two questions that are all but dispositive. The government admits that, and then they go on page after page after page, recycling the same argument that they made in the SEC case in the Third—I'm sorry, in the Fifth Circuit, and then before the full panel and before the Supreme Court. It's just the same argument over and over again. So JARCISI rested on this—the SEC rule basically codifying common law fraud. There's nothing—there's not a common law penalty for hazardous materials shipping. You can't seriously say this is just like public nuisance or something like that. So it's not just like JARCISI. You know, this is a new set of penalties that they enacted. Now, granted, there's this negligence mens rea, but it's hard to see what in the common law this is codifying. It really is just negligence. That is exactly what it is. And in fact, the statute— Negligence towards whom? The tort law is negligence towards a victim. Who's the victim here whom the government is supplanting, whom the government is compensating with this? This can of paint leaked a little bit. Who's the victim? Who would be the tort victim in a common law suit at Westminster in 1791? Federal Express. Federal Express. Did any of these penalties go to Federal Express? No, but they're— Was this suit brought by Federal Express? This is still analogous to what Federal Express would allege if they were— That would be to compensate Federal Express for an injury it suffered. There's no compensation going on here. Well, the idea is— Was there any injury? The idea— Was there an injury? Answer Judge Fisher's question. The idea of the statute, Judge— How was Federal Express injured by the leaking paint, Kim? They had to clean it up. And the government in this case is saying we want to punish and deter anybody who— We want to punish and deter. We don't want to— We're not compensating here. We're punishing and deterring. That is exactly right, and that's exactly what Jarcusy said is the basis for determining that a civil penalty, especially when the standard by which the defendant is being measured is a negligent standard, if the answer to those two questions is yes, it is all but dispositive on the question of whether jury rights apply. But the government is trying to take a little but and turn it into a big but. You don't get to the public rights issues. You don't get to the issue of whether there is a—you don't get a public right, whether it's a novel subject matter, whether it's a comprehensive regulatory scheme. You don't get to that except as an exception. There's essentially a presumption that Jarcusy creates, and the government goes on page after page. So wait, so you don't see this as a two-part test analytically? You see it as, as you say, a shingle on a roof. It is two parts in the sense that the first part is all but dispositive. The second part is the eye of a needle, trying to come up with some reason to avoid jury rights because there's something different about this case. And what Jarcusy recognizes, following the line of cases that led up to it, whether it overrules Atlas Roofing or not, what it's telling you is that those issues, you know, the comprehensive regulatory scheme and so forth, those are not a trump card. That doesn't get you around jury rights. The jury rights are there unless you can show there's some other reason. But here the Hazardous Materials Transportation Act and the civil penalty that's provided for here is really much more like the Clean Air Act penalty or the Securities Exchange Act penalty in Jarcusy. It's, like I said, it's not a building code. It's not something that, where you wouldn't even have a question to present to a jury, where you couldn't have a directed verdict. So, you know, essentially, I don't think this court has to decide what shingles got blown off. This isn't one of them. This is not a trump card, what the government is going to argue to you. It doesn't mean that they get around jury rights. So you're saying that you, so your pretty much main argument is they've already conceded the case away, nothing to decide here, basically. I would say yes, pretty much, because they do not establish anything in that but. Like I said, it's still just a tiny little exception that Jarcusy allows, and I don't see how their argument gets around that exception. All they want to do is essentially talk about the first two questions. They want to second guess those first two questions by which they got to the conclusion that it implicates jury rights. But there's a separate major. Mr. Cox, I want to ask you a question about the jury rights exception. It seems to be cited in the government's brief and in the department's analysis that the Supreme Court has provided for an exception where Congress was legislating in the anti-state reform and foreign commerce period. Do you agree that there is such an exception merely based on interstate or foreign commerce? No, and Jarcusy tells you that it's not, because that's based on interstate and foreign commerce as well. There's a second major concession, if I could hit it real quick. Actually, I have about 30 seconds left. The separate major concession came having to do with Article II, and I think one can say that it requires vacatur, the fact that this judge was not properly appointed and did not have and had multiple levels of protection, and the Justice Department itself in a previous case established the precedent as to what the remedy should be for that. If you look at the Polly Weave case, which is cited in our reply brief on pages 19 and 20, you look at Jarcusy and you see what the government did with that when they realized that a civil penalty order was issued with no authority. And the answer was not, well, that's just too bad that we issued it with no authority. The answer is it has to be vacated. They said specifically the official who issued the agency decision to impose a civil penalty was invalidly appointment, and the government therefore agrees that the decision should be vacated. So to address both the merits and the remedy, I know there are all these other cases. Are you talking about the 28J letter that the government sent in? Yes, Judge. What about our NLRB versus Starbucks decision? It's fairly recent. Are you familiar with that? That decision is a situation where Starbucks never even raised the issue. The court really said we're not going to get to that issue. Well, we're going to get to it anyway, but we can't get to it because it wasn't raised. And so I would call that dicta. I mean, you can ask your colleagues, I suppose, whether they meant that as dicta, but if you can't reach the case, I don't know how you can issue. If you can't reach that issue, I don't know how you can reach the issue. Well, you essentially say you have to show some sort of harm, and that's the point the government made. They said we're not going to argue it, but it appears that this doesn't fit anyway. Well, I think that if there's harm, like an axon, if you have a here and now injury, having to face the prospect of going through the ringer, this case is eight years old, Judge. If you face the prospect of having to go through eight years of this, I don't see how that's less harm than if you've already been through eight years of this. And like I said, the Justice Department has already said the right answer here, and we have gone through years of administrative proceedings, and the government didn't say, well, since you've already been through all this, you have to prove that you would have gotten a different answer if you'd had somebody who actually did have the constitutional authority to issue the order. I see my time is up. Do you have anything else, Judge Fischer? Okay, thank you. We'll hear from your friend. Thank you. May it please the Court, Daniel Aguilar for the FAA. So just to start on the last point, that was the end of the colloquy there, there's a distinction between lacking constitutional authority to exercise the office, which is the appointments clause, and here at JA62 is the appointment of the ALJ in 2019. This proceeding only started in 2021. At that point, the ALJ was properly appointed and could exercise the authority of his office. Two is about unconstitutional removal restriction. And what the Supreme Court explained in Collins and this Court explained in Collegiate Master and Starbucks is that that doesn't go to the actual authority to exercise the office, it goes to control of the executive branch through the president. And there, under Collins and Starbucks and every other case for which I'm aware in the Court of Appeals, what's been held is you need to demonstrate some sort of compensable harm. Here, Ex Alta has not suggested anything other than merely going through the proceedings. That's insufficient. And so for that reason, we think you can dispose of the removal challenge. Turning to the Seventh Amendment inquiry here. So we agree that the Supreme Court has not set clear boundaries necessarily between what is strictly private and strictly public. There are, of course, claims that exist in the heartlands of those, but Jarkissi, Grand Financiera, all of these decisions admit that there is some lack of clarity in between. Jarkissi has harsh words for atlas roofing. It doesn't overrule it. But it seems to suggest we shouldn't expand it. Why is it that we should put this case on the atlas roofing side of the line when it punishes negligence? So first, I wouldn't agree that it punishes negligence. But also, just to your honest point, I don't think the dichotomy is strictly atlas roofing versus Jarkissi. I think what the Court's getting at is, in the second part of its analysis, right, public rights versus private rights, is the government acting in a quintessentially sovereign capacity, public rights, or is it stepping into the shoes of an individual who could have brought a common point? Why isn't Jarkissi acting as a sovereign to punish fraud, not compensate, punish? So I think that that's where the Supreme Court's public rights analysis was coming in. Congress's goal was to punish fraud, but by doing so, it drew on and incorporated the common law, both in its terms, in the standards to apply, in what materiality was, et cetera, et cetera. It was taking all of this old soil with it. And we think that for a confluence of reasons here, that's not what Congress was doing in the Hazardous Materials Transportation Act. So just to list through some of the factors here. First, it's regulating hazardous materials to prevent massive disruption to transportation industry across the nation. Railroad lines being shut down, airplanes falling out of the sky, channels of commerce closed. This isn't interstate commerce as a jurisdictional hook. And, Judge Fischer, our argument isn't categorically, whenever it's interstate commerce or foreign commerce, it's automatically public rights. That's not the extent of our argument. Here, you're actually regulating instrumentalities and channels of commerce to protect them. Second, as Your Honor noted, it's not compensatory. It is designed to ensure compliance with this scheme. It's Congress's ability to prohibit the transportation of hazardous materials in interstate and foreign commerce writ large. That absolute ability to prohibit. And here, that is what Congress did. It gave the Secretary of the Regulatory Authority, and at 49 CFR 171.2E, and also F, E is in our addendum, it makes clear you cannot offer or accept hazardous goods for shipment unless they comply with these. Otherwise, they're forbidden to move in that commerce. What Jarkissi noted when it was discussing the previous case of oceanic steam navigation is that there were Congress's abilities absolute to prohibit the ability of things to move in foreign commerce. There, it was underscoring why, in that case, a violation of the immigration laws permitted Congress to assign civil penalty authority to the executive branch. Still, though, the court in Jarkissi said on page, well, actually in a footnote, Atlas Roofing represents a departure from our legal traditions. Okay? Shouldn't we be hesitant to drop things into that category versus the other private rights? So we're not saying that public rights should swallow up everything. We take that note of Jarkissi seriously. I also think what the court's talking about there is Atlas Roofing is saying what matters really is the forum to which it's assigned, and that can be perhaps dispositive of the Seventh Amendment right. Crown of Concierge obviously walks that back, and that's why Justice White dissents. And the Supreme Court in Jarkissi noted Justice White dissented in Crown of Concierge because he really took issue with that. He thought Congress's assignment to the executive is demonstrating that the Seventh Amendment doesn't apply. Our argument here doesn't rest on that analysis. First of all, that then would make the Seventh Amendment so easy to gut. But second, because the Seventh Amendment is connected with the Article III analysis, that would also make Article III – it wouldn't be a bulwark. It would just, again, be super easy for Congress to get around whenever it wanted. So what's the limit here? What would the government – what if the government had this same scheme, except it then took the money recovered from Exalta and gave it to FedEx to defray the cleanup costs? Wouldn't that make it like a tortsuit? So two things, Your Honor. First, I was just explaining what I understood the reasoning to be. We're not advancing that as a reason to affirm the decision here. Two, I think, yes, once you start changing the underlying facts, you make it more compensatory. It's the government acting in FedEx's terms to supply the cleanup, to do all of these other things. That is acting more along the lines of the common law, and it's going to be a harder case in those instances. But that's obviously not what's doing here, right? And the last step is just to – the Supreme Court said Atlas Roofing is different because it's enacting a reticulated code that was unknown to the common law. Yeah, a reticulated code. I mean, that might be necessary, but it can't be sufficient because then all Congress has to do is write things more specifically than tort law did. And that's – again, we're not saying that that's dispositive. It's one of the confluence of factors here, which is showing why it's more like public rights. And I think the reason that it matters analytically is it's saying this isn't drawn from the common law. The common law didn't have these standards. It's not adopting fraud, materiality, misstatement, reliance, all of those things, like the SEC was in fraud, or like Crown Financiera, the fraudulent actions that could be brought at common law, and that was well-documented in that case. This is saying it doesn't really matter whether or not a reasonable person would think that this is a good way to package it. We have real concerns about the systems of transportation being disrupted, not only from these things leaking or in this court's Roth decision, you know, sulfuric acids blowing out of a railway tank. We have concerns about if this causes evacuations around it, well, now, you know, trains, planes, automobiles can't go through there. It sounds to me like you're talking about it. The Congress was concerned of an injury to anyone who came into contact here, the FedEx employees, or even bystanders, or with a rail car overturning last year in East Liverpool, Ohio, who had an injury to an entire community. Doesn't this, you know, doesn't this, isn't this different than the OSHA? No, I actually think it's very much on point. Both in Atlas Roofing and here, right, you could make a comparison to the common law at a surface level, right? In Atlas Roofing, you could say the OSHA is just premises liability, but you've subtracted injury, right? It's saying that you've invited someone on there for their work. It's unsafe. You don't have to show injury. There's a violation. That's not what the Supreme Court held in Atlas Roofing. And Jharkhasi says, to the extent that Atlas Roofing is different, here's why it's different, is that that comparison to the common law doesn't work. It's not drawing on those standards. It's conspicuously self-novel. In comparing the two acts, you know, with OSHA, government went out with some frequency, whether it be at the beginning or during the course of the use of a particular building, and made inspections to see whether or not it was in compliance. Here, there's no violation asserted until something happens like a can of paint leaking and it being discovered. I mean, this sounds to me like more of an actionable injury situation than what you had at Atlas. And, I mean, take that together with the reference to the reasonable person, reasonable care, reasonable person standard. It seems to me that this is very much and very difficult to distinguish between the common law and the equities plan. I'm sorry, Your Honor, where is the reasonable person standard? I know opposing counsel cited that up here. I wasn't sure which regulation or statute we were talking about. We're talking about the knowledge standard. It's not talking about the duty of care or the reasonable exercise. What that's addressing is the knowledge standard that they raise on whether or not you've satisfied the knowledge standard, right? What the Seventh Circuit said in the common carrier case is previously this was just a strict knowledge standard. You don't have a case if you don't satisfy a knowledge standard. If I could, because I think this answers your question, Your Honor. So in the Seventh Circuit case, they were saying you have to have actual knowledge. You don't just have the willful blindness or constructive knowledge. And that's why in that case where it was independent contractors who had packaged the hazardous materials, the Seventh Circuit said you can't directly impute knowledge if what's required is actual knowledge. The court then held but, and this may be demonstrated on remand with additional evidence, if it was the company's actual employees who were packaging it, that satisfies an actual knowledge standard. And here that's what we had is Exalta's employees signed the particular statement. It's in the supplemental appendix saying we understand this is hazardous material. It's paint. Here's how it's been packaged. We're offering it for shipment. And so the reasonable person standard is going to constructive knowledge. It's not going to a duty of care or a breach. That's not what the Hazardous Materials Transportation Act or regulations are doing. They're setting forth that reticulated scheme. We don't think that that ends the day, but it combines with the fact that Congress really was here acting in a sovereign capacity, the only way it could, the only entity that can regulate these interstate channels and instrumentalities of commerce as they are instrumentalities and channels, not as a jurisdictional hook to generally regulate other activities within that space. It's designed to ensure compliance with that new and novel scheme that had not existed before, not to step into the shoes of individuals who might be able to assert other claims. It's doing something quite different. For those reasons, we think this is a public right, and that that is why Congress, as it did when it enacted this, can assign that adjudication to the executive branch in the first instance. And if I could just one more, I'm happy to answer questions, but just on the one more point. In their reply brief, Exalta asserts us of misleading the court. That is erroneous. They said that we lied about the availability of appointments. That is not true. At JA62, when Exalta said, we don't think this ALJ has been properly appointed, we provided the ALJ's appointment letter. Exalta points to other FOIA claims that are made by different entities concerning different parts of DOT and saying that, therefore, when we asserted that these should be available under FOIA, that was a misrepresentation. That is inaccurate. DOT, I can represent, has provided those appointments that that other requester asked for in the FOIA litigation or in the FOIA request on February 10th. It included an appointment memo to the Secretary of Transportation saying these people should be appointed and included the appointments signed by the Secretary. Those are available in FOIA. Those are acts of the government. They should be regularly made available upon request. But to the claim that you need that at the front end and some public ceremony in order for a constitutional appointment to be otherwise valid, that has no basis in the text of the appointments clause or any precedent interpreting it. They cite a document that purports to be internal government guidance. Taking that for what it's worth, that document says that it would be appropriate to consider this and to have some ceremony, but that obviously is not a constitutional requirement. I'm happy to answer any other questions the Court has. Since you have a couple of minutes here, what about the Section 5127D? I take it you argue that we can't consider this argument about unconstitutional delegation of legislative power to the FAA and whether that has been forfeited or waived. Your friend says there are reasonable grounds for not making the objection during the administrative proceeding or that perhaps even that the agency declined to consider the objection. They say it would have been futile anyway. What's your position on that? One, as you note, there's a statute and regulation saying you need to preserve these requirements. EXALTA was able to raise a number of constitutional objections within the proceeding. We don't think that this satisfies a reasonable ground standard. If you were to go to the merits, what they're claiming is that the executive branch, by choosing where and how to bring an enforcement action, is exercising legislative authority. That's incorrect. There are a number of ways in which the executive brings enforcement actions and makes charging decisions that might affect what might be determined to be somewhat a right. Charging a petty misdemeanor instead of a felony affects whether you get a grand jury or a petite jury. If there's a continuing violation in a criminal offense, charging in one venue rather than another might change the applicable circuit law that's available for substantive standards or what needs to be applied, et cetera. But those decisions about where and how to charge are executive decisions about how to enforce the law. But to be clear, your argument is that we shouldn't be considering it in the first place because it wasn't raised? That's right. And Ross v. Blake is a Supreme Court decision here saying you can't craft new judicial exceptions to it. It has to be within what's the text. The text has reasonable grounds. And as we've explained in a brief, we don't think that's satisfied. Judge Fischer, do you have anything else? All right. Thank you, counsel. Thank you. And we'll hear rebuttal from your friend. Thank you, Judge. I appreciate Mr. Engelbart bringing up the third concession that I didn't get a chance to get to in the principal argument, and that is that the Hazardous Materials Transportation Act requires the government to establish scienter. The ALJ in this case said the complaint need only allege that Exalta knowingly shipped paint. That is a strict liability standard if I ever saw one. And that is what the agency approved. But on the issue of knowledge, which Judge Fischer raised, we pointed out in a brief that, at least in the criminal cases of Rafe and Flores, and in a civil case, national power in the Seventh Circuit, the language has to be interpreted in accordance with English. If it says you knowingly violated something, they have to show they knowingly violated something. It doesn't mean you have to show that they knowingly shipped something. Those are two completely different issues. There is nothing that I could find in the government's brief that explains their position on that. And that's particularly important when we look at the number one thing that the ALJ focused on, and which Mr. Aguilar mentioned, which is subsection .2e. That was supposedly the violation in this case. But read what 2e says. It says that what a person has to do, what a packer has to do, is to close it in accordance with other regulations. That's just one stop on a decision tree that a hazmat packer who's making, you know, maybe a minimum wage, they can at least, and this is one part of the HMRs, it's not complicated. It says you have to use the instructions that came with the packaging. You have to look at what the can manufacturer told you to do. If it's different by air than it is by ground, you do what is required by air. Those packaging instructions are not in this case. They were never alleged. They were never even part of the record. And I think because of that, and I hate to build on section 173.27d, right? No, I'm talking about, I didn't write down the entire site, but it's .2e. The order itself is based on .2e. I think it's 172.2e? Yeah, 49 CFR 171.2e. Yes, that's it. And that's what the judge says was violated. And all it says is that one has to, a packer has to comply with other regulations that tell you what to do with a package. And in this case, what those regulations tell you to do, and this is in the end of our brief, because I didn't want to get the court too much into the weeds. If we start looking at these 1,200 pages, we'd all get tremendous headaches. I've been living with this case for eight years and these issues for ten years. And I can do it, but I can do the same thing that a minimum wage hazmat packer can do, and that is I can follow a decision tree. It says 2e says you have to follow other regulations. What do the other regulations tell you about this can of paint? And the way you find out is you read the instructions that came with the can. There's all kinds of very complicated packaging products out there. But paint cans are not complicated. And they're all tested, and they have to be closed in accordance with the way they pass the test. And if they tested it with the kind of pressure you would see on an airplane and told you you have to use ring locks, then you have to use ring locks. But the closure instructions in this case were never put in the record at all. This court cannot say, and the ALJ could not say. The FAA expert didn't provide some information about that? Well, Judge, I invite you to look at the record. It's not there. And my brief mentions it twice, in the main brief and in the reply brief. And so there's just no way you can say that this packer didn't do what a reasonably prudent packer would do. So I just really think that the government has made this case, this decision, even easier for you with the presentation that they just gave. And I think it really is important to recognize, as the Chief Judge pointed out, when we're talking about something as precious as the Seventh Amendment, how do you land something like this on the side of no jury? And, again, at the risk of sounding like I'm whining, just look at what happened in this trial, where the federal rules of civil procedure weren't applicable, where there were no Brady rights, where we were told the one and only witness that FAA put on is an expert when he's testifying for the FAA and a layman when he's testifying in rebuttal, or when he's being questioned about his opinion. He'd be qualified as an expert only to testify in one direction. If I could, I'd like to just ask you a question. In reading the Jurisdiction and reading the other precedent from the Supreme Court and trying to determine how your case fits into the Jurisdiction, it struck me that the Supreme Court was expressing some significant frustration with the implications of the Dodd-Frank Amendments to the security code, and that perhaps the analysis of what took place in that enforcement action against Gergesy and his companies led to really an exception to what their prior jurisprudence had been in this public versus private regulatory. Do you have any comment on that? Only that the ability to try to reconcile Atlas Roofing with Gergesy is beyond me. And I'm not saying what this Court should do about recognizing it as having been overruled or not. I'm just saying that when it comes to a situation like this, it's really crucial to stand up for something as important as the Seventh Amendment. And if I could just say before I sit down, what an incredible honor this is at this point in my career to have a chance to stand up for the Constitution right here in Philadelphia. So thank you. This is eight years in coming, but thank you, judges, very much for the opportunity. I truly appreciate it. Thank you, counsel. Thank you. We'll take the case under advisement and thank counsel for their excellent briefing and oral argument today. We'll ask the clerk to adjourn court, and if counsel is willing to meet us at sidebar, we'd love to.